**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION (BALTIMORE)**

| | | |
|---|---|---|
| **RONALD APPLER,** | * | |
| 1161 Day Rd | | |
| Sykesville, MD 21784 | * | |
| | | |
| Plaintiff, | * | |
| | | |
| v. | * | |
| | | |
| **BROWNING ARMS COMPANY,** | * | **CIVIL ACTION NO.:** 1:22-cv-02794 |
| 1 Browning Place | | |
| Morgan, UT 84050 | * | |
| **SERVE ON**: Keven Rowe, Registered Agent | | |
| 111 S Main St, Suite 600 | * | |
| Salt Lake City, UT 84111 | | |
| | * | |
| Defendant. | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFF RONALD APPLER'S COMPLAINT FOR DAMAGES

Plaintiff Ronald Appler ("Mr. Appler"), by and through his counsel, Whiteford, Taylor & Preston LLP, hereby files this complaint for damages against Defendant Browning Arms Company ("Defendant Browning") and states as follows:

1.  This lawsuit arises from a November 29, 2020 incident in which Mr. Appler sustained serious injuries while firing his brand-new Winchester Model XPR rifle (the "Winchester Rifle"). The injuries resulted from the failure of the body of the bolt and its locking lugs.

2.  Mr. Appler suffered catastrophic injuries to his face, right eye, right hand and right shoulder when the Winchester Rifle exploded. The explosion drove the bolt off of the gun and into his face, where it was lodged, gruesomely piercing his cheek.



He also suffered debilitating injuries to his right eye, right hand and right shoulder.

3. As discussed herein, the bolt "left the action," which is a defect of material in the Winchester Rifle. The consequences of he material defect were exacerbated by flaws in the design of the Winchester Rifle, which are discussed herein.

4. Defendant Browning, which designed, manufactured, marketed and sold the Winchester Rifle, is liable for this defect as a result of negligence and strict liability.

## THE PARTIES

5. Mr. Appler is a resident of Sykesville, Maryland. He is an experienced and sophisticated user of firearms.

6. Defendant Browning is a Utah corporation with its principal place of business at One Browning Place in Morgan, Utah 84050. Browning is the exclusive licensee of the Winchester for the purpose of designing, manufacturing and selling firearms bearing the Winchester name. It licenses the name from the Olin Corporation which owns the Winchester trademark but itself does not make firearms (Olin does manufacture and sell ammunition under the Winchester name). Defendant Browning designed, manufactured and put into the stream of commerce the Winchester Rifle purchased by Mr. Appler.

**VENUE AND JURISDICTION**

7. Venue is proper in this judicial district as Mr. Appler resides within this judicial district, and the Winchester Rifle failure incident occurred while Mr. Appler was firing the Winchester Rifle at firing range located in Westminster, Maryland, which is also located within this judicial district.

8. This Court has subject-matter jurisdiction over this matter pursuant 28 U.S.C. §1332 because Mr. Appler seeks well in excess of $75,000 in damages and because the Parties have a complete diversity of citizenship.

**THE WINCHESTER MODEL XPR BOLT ACTION RIFLE**

9. Mr. Appler is the owner of the Winchester Rifle, which he purchased from Rocky Mountain Discount Sports in Cody, Wyoming for $520.99 on November 17, 2020.

10. The Winchester Rifle is a center-fire, bolt-action, repeating rifle of modern design and purportedly modern materials. It is a push-feed, three lug action with a sliding extractor mounted in one locking lug and plunger ejector in the bolt face. The bolt body is full diameter (.875) with the three lugs machined from that diameter. A fourth 'safety lug' is the bolt handle that is turned into a recess on closing. The bolt handle is flexibly mounted to the bolt body.

11. A bolt action rifle is a type of rifle which is loaded by the shooter manually operating a bolt. The movement of the bolt by the shooter is called a "firearm action." A bolt-operated firearm action occurs when the shooter manually operates the rifle bolt by using a small handle, usually located on the right side, to open and close the gun breech. Pushing the handle up and pulling it rearward unlocks the bolt and opens the breech. If there is a spent cartridge case in the gun's chamber, the opening of the breach ejects the cartridge case, the firing pin is cocked, and

3

a fresh round is withdrawn from the magazine and placed into the chamber. Closing the bolt makes the rifle ready to fire again. The bolt of the Winchester Rifle looks as follows:



12. Winchester touts the XPR model as being very safe. The XPR rifles have a two-position safety that is designed to be convenient to operate with the thumb of the shooter's firing hand. The XPR's thumb safety slider is moved back for Safe and forwards for Fire. On Safe, the bolt is locked and can't be manipulated. A bolt-release button is positioned in front of the safety. Pushing forwards on this button unlocks the bolt, allowing it to be removed for unloading or disassembly while the gun is on safe. According to the Winchester website, this bolt-action design, especially "the addition of the Bolt Release Button, just in front of the safety button, puts you at even more at ease, allowing you to unload unfired cartridges whiles the safety is on. ***Very handy. Very safe. The XPR has you covered on safety.***"[1] (emphasis added).

---

[1] https://www.winchesterguns.com/products/rifles/xpr/xpr-intro.html

13. Sadly, as Mr. Appler was to learn, his XPR rifle was not "very safe" and the Winchester Rifle did not have him "covered on safety."

## THE WINCHESTER RIFLE MALFUNCTION INCIDENT

14. Less than two weeks after purchasing the Winchester Rifle, Mr. Appler took it the Hap Baker Firearms Facility in Westminster, Maryland so he could sight it in the rifle.

15. On approximately the 24th shot of Mr. Appler's sighting in session, the Winchester Rifle exploded in Mr. Appler's hands while his eye was lined up in the telescopic sight.

16. The explosion had catastrophic consequences. The bolt was ejected completely out of the rifle and impaled itself in Mr. Appler's face, and the gun spread shrapnel many feet away. A five-inch piece of the plastic stock was observed in the lane next to the one in which Mr. Appler was shooting, and the shooter in lane 9 suffered a cut above his right ear. The responding officer wrote in the police report that "[t]he explosion from the rifle dispersed metal pieces throughout the shooting platform."

17. As described by the police officer who responded to the scene, "I observed Ronald to have a bloody right thumb. I observed Ronald to have a large piece of a metal object protruding from the right side of his cheek and an exit wound to his upper right cheek. It was later determined it was the bolt action from the rifle. I also observed Ronald to have a bloody eye."

18. The Winchester Rifle was inspected by a professional firearms expert who concluded that the rifle suffered a catastrophic failure as a result of the failure of the locking lugs. This failure allowed the bolt to be blown backwards and through the face and into the shoulder of Mr. Appler. The firearms expert had never seen a bolt leaving the action like occurred in Mr. Appler's gun in his half century long career.

19.     The locking lugs showed evidence of brittle and conchoidal fractures the locking lugs failed in tension which caused the bolt to leave the action. This was a metallurgical failure of the locking lugs.

20.     In addition to the metallurgical failures, the Winchester Rifle suffered from a design defect in that the locking lugs, unlike on nearly every other bolt action rifle, overhang the bolt face. This design feature permits the rapid expansion of the cartridge case to act directly in tension on the locking lugs in a way that the typical non-overhanging design does not. In addition, the Winchester Rifle lacked a receiver vent. A receiver vent acts to limit peak pressure, and the absence of a vent exacerbated the incident involving the explosion of the Winchester Rifle.

21.     The decision to omit a receiver vent from the design of the rifle was an intentional engineering decision that Winchester knew or should have known would adversely affect safety when a user fires the XPR rifle.

22.     The decision to depart from all prior gun models made by Winchester and every other bolt action gun maker and to design the Model XPR with overhanging locking lugs was an intentional engineering decision that Winchester knew or should have known would adversely affect the safety of the Winchester Rifle while a user is firing.

### MR. APPLER'S SERIOUS INJURIES

23.     Mr. Appler was rushed to the hospital, where he received emergency treatment. Mr. Appler, who was 68-years old at the time of the incident, presented with right-sided facial and shoulder injuries with "open degloving blast injury" to his dorsal thumb. Radiological studies of Mr. Appler's right-hand reflected "extensive soft tissue injury" and a fracture of his right thumb. A radiological study of his face reflected a "ballistic fragment" in his right cheek. Mr. Appler also presented with "2 puncture wounds" to the right-side of his face; "a [right-]shoulder puncture

6

wound[;]" right eye trauma; a "right parotid [i.e., sallivary] gland injury[;]" and "non-displaced fractures" in the lateral and posterial walls of his right-nasal cavity. Mr. Appler was also found to have a right-orbital fracture.

24. Mr. Appler complained of "[right] eye pain and blurriness" at the hospital, stemming from "2 small pieces of glass over [the] surface of [his] right eye," which were painfully removed. There was blood in Mr. Appler's right-eye, with a "2 [centimeter] wound anterior and interior to the right eye with [an] exit wound on the right interior" of his ear. In addition, an "imbedded bolt action piece" was observed in Mr. Appler's right shoulder, which was "removed … with small underlying laceration."

25. Mr. Appler's injuries were serious enough that he was admitted inpatient at the hospital. On December 1, 2020, Mr. Appler underwent a right-hand incission, irrigation, and debridement; open reduction internal fixation of his right thumb (including tendon repair); a skin graft; and an adjacent tissue transfer or rearrangement.

26. After being discharged on December 2, 2020, Mr. Appler saw an opthalmologist to attempt to address decreased vision in his right-eye. The opthalmologist found "an additional small shard of glass" in Mr. Appler's right-eye, and removed it. Mr. Appler was required to use eye drops on an hourly basis, and tape shut his right-eye while sleeping at night.

27. Mr. Appler followed up again with the opthalmologist on December 7, 2020. He was diagnosed with vitreaos hemorrage (internal leakage of blood) of his right-eye; hyphema (accumulation of blood between the cornea and iris, causing eye pain, blurred vision, and sensitivity to light); a chorioretinal scar (area of pigmentary change or fibrosis) of his right-eye; traumatic optic neuropathy (damage to his optical nerve); and parlytic lagopthalmos (incomplete closure of eyelid due to paralysis of the seventh cranial nerve) of his right-eye.

28. On December 10, 2020, Mr. Appler followed up at the hospital for removal of the dressing sewn onto his skin graft. He returned for another scheduled visit on December 17, 2020, where "staples [were] removed from his right hand." He had to return the next day for treatment of a wound dehisance (surgical complication in which the wound ruptures along a surgical incision); after the staples were removed from his hand, "the incision opened at the center." Mr. Appler thus underwent a second irrigation of the wound.

29. Mr. Appler followed up for a scheduled visit on January 1, 2021, rating his pain as 3-4 out of 10. Other sutures and "K [surgical] wire" was removed from his right-hand; the pain medication Mr. Appler had been prescribed was re-filled. Mr. Appler had to undergo, at home, painful strenghening exercises for his surgically-repaired hand.

30. On March 11, 2021, Mr. Appler appeared for another follow-up, demonstrating the ability to extend and flex his right-thumb. His provider encouraged him to begin a "graduated resistance program."

31. Mr. Appler has incurred over $50,000 in medical expenses and the amount increases as time goes by because he continues to undergo physical therapy. He also suffered immense pain and suffering from both the trauma of the event and the struggle of a prolonged recovery. He has suffered permanent scarring, dimunition of movement and diminished eyesight.

## COUNT I
## STRICT LIABILITY - MANUFACTURING DEFECTS

32. Plaintiff hereby adopts, reiterates and incorporates all allegations set forth in the preceding paragraphs as if fully set forth herein.

33. Defendant Browning is obligated to refrain from placing in the stream of commerce products that were in defective condition, unreasonably dangerous to foreseeable purchasers and users of its products.

34. At all times pertinent to this action, Mr. Appler was using the Winchester Model XPR for the purposes for which it was intended by Defendant and in a manner that was foreseeable, and without any knowledge or notice of the defective condition that was unreasonably dangerous in the Winchester Model XPR.

35. At the time the Winchester Model XPR was manufactured and placed into the stream of commerce by Defendant Browning, it contained manufacturing defects that were unreasonably dangerous to persons, such as Mr. Appler. As a result of the manufacturing defects of the Winchester XPR, the Winchester XPR purchased by Mr. Appler failed to perform as an ordinary consumer would expect when utilizing the rifle in an intended and/or reasonably foreseeable manner. As a direct and proximate result of the manufacturing defects of the Winchester Model XPR, Mr. Appler's Model XPR exploded and resulted in him suffering catastrophic injuries.

36. The manufacturing defects of the Winchester XPR were the direct and proximate cause of the injuries and damages suffered by Mr. Appler.

37. As such, Mr. Appler is entitled to recover compensatory damages in excess of the minimum jurisdictional limits of this Court.

## COUNT II
## STRICT LIABILITY  - DESIGN DEFECT

38. Mr. Appler hereby adopts, reiterates and incorporates all allegations set forth in the preceding paragraphs as if fully set forth herein.

9

39. Defendant Browning was obligated to refrain from placing in the stream of commerce products that were in defective condition, unreasonably dangerous to foreseeable purchasers and users of its products.

40. At all times pertinent to this action, Mr. Appler was using the Winchester Model XPR for the purposes for which it was intended by Defendant Browning and in a manner that was foreseeable, and without any knowledge or notice of the defective condition that was unreasonably dangerous in the Winchester Rifle.

41. At the time the Winchester Model XPR was designed and placed into the stream of commerce by Defendant Browning, it contained design defects that were unreasonably dangerous to persons, such as Mr. Appler, who reasonably would encounter such product as it was put to its intended use.

42. As a result of the design defects of the Winchester Rifle, the Winchester Rifle purchased by Mr. Appler failed to perform as safely as an ordinary consumer would expect when utilizing the rifle in an intended and/or reasonably foreseeable manner and/or the risk of danger inherent in the design of the rifle outweighed the benefits of its design.

43. As a direct and proximate result of the design defects of the Winchester Rifle, Mr. Appler suffered debilitating and catastrophic injuries.

44. The design defects of the Winchester Rifle were the direct and proximate cause of the injuries and damages suffered by Mr. Appler.

### COUNT III
### NEGLIGENCE  -  MANUFACTURING

45. Mr. Appler hereby adopts, reiterates and incorporates all allegations set forth in the preceding paragraphs as if fully set forth herein.

46. Defendant Browning owed a duty of care to Mr. Appler and other persons similarly situated to use reasonable care in designing, testing, assembling, manufacturing, inspecting, marketing and selling of the Winchester Rifle at issue and in the testing of any component parts made by another so that the rifle would be safely used in a manner and for the purpose for which it was made.

47. Defendant Browning breached its duty of ordinary care to Mr. Appler by designing, developing, testing, manufacturing, inspecting, marketing and selling the Winchester Rifle in such a negligent manner that it was likely to malfunction even while being used in an intended and/or reasonably foreseeable manner.

48. The negligent design, development, testing, manufacturing, inspecting, marketing and selling of the Winchester Rifle was a direct and proximate cause of the injuries and damages suffered by Mr. Appler.

49. As such, Mr. Appler is entitled to recover compensatory damages in excess of the minimum jurisdictional limits of this Court.

## COUNT IV
## NEGLIGENCE - DESIGN DEFECTS

50. Mr. Appler hereby adopts, reiterates and incorporates all allegations set forth in the preceding paragraphs as if fully set forth herein.

51. Defendant Browning owed a duty of ordinary care to Mr. Appler and other persons similarly situated in designing, developing, testing, manufacturing, inspecting, marketing, and selling of the Winchester Rifle at issue so that the rifle would be safely used in a manner and for the purposes for which it was made.

52. Defendant Browning breached its duty of ordinary care to Plaintiff by designing, developing, testing, inspecting, manufacturing, marketing and selling the Winchester

Rifle in such a negligent manner that it was likely to malfunction even while being used in an intended and/or reasonably foreseeable manner.

53. The negligent design, development, testing, manufacturing, inspecting, marketing and selling of the Winchester Rifle was a direct and proximate cause of the injuries and damages suffered by Mr. Appler.

54. As such, Mr. Appler is entitled to recover compensatory damages in excess of the minimum jurisdictional limits of this Court.

## COUNT V
## STRICT LIABILITY - DEFECTIVE WARNINGS

55. Mr. Appler hereby adopts, reiterates and incorporates all allegations set forth in the preceding paragraphs as if fully set forth herein.

56. At the time the Winchester Rifle was designed, manufactured, and placed into the stream of commerce by the Defendant Browning, it lacked and/or contained defective warnings that rendered the Winchester Rifle unreasonably dangerous to persons, such as Mr. Appler, who was an intended and/or reasonably foreseeable user.

57. At all times material hereto, the Winchester Rifle was maintained and the warnings read and comprehended as often and as completely as a reasonably prudent person would have done under the same or similar circumstances and, at no time material hereto, was the Winchester XPR subjected to any unintended and/or unforeseeable conditions.

58. At all times material hereto, the use of the Winchester Rifle in a manner that was intended and/or reasonably foreseeable by the Defendant Browning involved substantial danger that would not be readily recognized by an ordinary user of the rifle, like Mr. Appler.

59. At all times material hereto, the danger(s) were known or knowable by Defendant Browning in light of the generally recognized and prevailing best scientific knowledge available at the time of the design, manufacture and distribution of the rifle.

60. At all times material hereto, Defendant Browning had a duty to provide adequate warnings to intended and reasonably foreseeable users, such as Mr. Appler, on how to use, maintain, recognize, and appreciate the dangers inherent with the Winchester Rifle.

61. At all times material hereto, Defendant Browning failed to give adequate warnings of the dangers associated with the use of the Winchester Rifle, or of the facts that made it likely that the Winchester Rifle was dangerous.

62. As a result of the lack of and/or defective warnings, the Winchester Rifle failed to perform as safely as an ordinary consumer would expect when utilizing the rifle in an intended and/or reasonably foreseeable manner and/or the risk of danger inherent in the lack of and/or defective warnings on or with the Winchester Rifle outweighed the benefits of the warnings, design and use of the rifle.

63. The lack of and/or defective warnings on or with the Winchester Rifle was a direct and proximate cause of the injuries and damages suffered by Mr. Appler.

64. As such, Mr. Appler is entitled to recover compensatory damages in excess of the minimum jurisdictional limits of this Court.

### COUNT VI
### NEGLIGENCE - WARNINGS

65. Mr. Appler hereby adopts, reiterates and incorporates all allegations set forth in the preceding paragraphs as if fully set forth herein.

66. At all times material hereto, the use of the Winchester Rifle at issue in a manner that was intended and/or reasonably foreseeable by the Defendant Browning involved the risks

of the breaking of the firing pin head and rifle firing in the bolt open position that would not be readily recognized by an ordinary user of the rifle, such as Mr. Appler.

67. At all times material hereto, this danger was known or knowable by the Defendant Browning in light of the generally recognized and prevailing best scientific knowledge available at the time of the design, manufacture and distribution of the Winchester Rifle.

68. At all times material hereto, Defendant Browning had a duty to provide adequate warnings to intended and foreseeable users, such as Mr. Appler.

69. At all times material hereto, Defendant Browning failed to give adequate warnings of the dangers associated with the Winchester Rifle.

70. The lack of and/or negligent warnings on the Winchester Rifle were a direct and proximate cause of the injuries and damages suffered by Mr. Appler.

71. As such, Mr. Appler is entitled to recover compensatory damages in excess of the minimum jurisdictional limits of this Court.

## COUNT VII
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

72. Mr. Appler hereby adopts, reiterates and incorporates all allegations set forth in the preceding paragraphs as if fully set forth herein.

73. Section 2-314 of the Maryland Commercial Law Code (or alternatively, Section 34.1-2-314 of the Wyoming Uniform Commercial Code) creates an implied warranty that all goods sold, including the defective Winchester Rifle, shall be merchantable if it is sold by a seller who is a merchant with respect to goods of that kind. Defendant Browning has sold and continues to sell goods identical to or similar to the Winchester Rifle at issue in this litigation.

74. Defendant Browning impliedly warranted to the public that the Winchester XPR, as sold, was merchantable, suitable for purchase, and safe for use by placing the Winchester XPR into the market for public purchase.

75. The Winchester Rifle sold to Mr. Appler contains latent defects, which, during their ordinary and anticipated performance, caused an unsafe condition to arise, causing severe and debilitating injuries to Mr. Appler while he was using the rifle in a foreseeable manner.

76. Mr. Appler had the reasonable general expectation that the Winchester Rifle he purchased was suitable and safe for purchase, and was designed and manufactured without defective components.

77. Defendant Browning breached the implied warranty of merchantability by selling a defectively designed, developed, tested, and manufactured firearm to Mr. Appler.

78. As a result of Defendant Browning's violation of the implied warranty of merchantability, Mr. Appler suffered injuries and damages.

## COUNT VIII
## CAUSATION AND DAMAGES

79. Mr. Appler hereby adopts, reiterates and incorporates all allegations set forth in the preceding paragraphs as if fully set forth herein.

80. As a direct and proximate result of the conduct of Defendant Browning, Mr. Appler has incurred the following damages:

    a. Mental anguish and mental pain and suffering;

    b. Past and Future Medical Expenses;

    c. Emotional Distress;

    d. Attorneys' fees and costs; and

    e. Punitive damages.

**WHEREFORE**, Plaintiff Ronald Appler requests the following relief:

1. Judgment in favor of Plaintiff Ronald Appler and against Defendant Browning Arms Company for compensatory damages for all injuries and losses complained of herein, together with interest from the date of injury until same is paid;

2. Judgment in favor of Plaintiff Ronald Appler and against Defendant Browning Arms Company for an additional judgment of punitive damages based upon the conduct of Defendant Browning Arms Company that was willful, wanton, reckless, and in extreme indifference to the health and safety of Plaintiff Ronald Appler;

3. Trial by jury; and

4. That Plaintiff Ronald Appler be awarded all of the damages enumerated above, including actual, consequential, incidental and foreseeable damages, punitive damages, attorneys' fees, costs herein expended, pre-judgment and post-judgment interest at the legal rate on all sums awarded for which such interest may be imposed, and any and all equitable relief that may be appropriate.

This, the 28th day of October, 2022.

Respectfully submitted,

/s/ *Eric C. Rowe*
Eric C. Rowe, Esq. (Bar No. 14816)
Erik D. Bolog, Esq.
    *(Bar No. 08904, INACTIVE, Renewal Application forthcoming)*
C. Allen Foster, Esq.
    *(Motion for Pro Hac Vice forthcoming)*
Jeffrey A. Leon, Esq.
    *(Motion for Pro Hac Vice forthcoming)*
*Whiteford, Taylor & Preston, LLP*
1800 M Street NW, Suite 450N
Washington, D.C. 20036
erowe@wtplaw.com
ebolog@wtplaw.com

cafoster@wtplaw.com
jleon@wtplaw.com
Telephone: (202) 659-6800
Facsimile: (202) 331-0573
AND

Masten Childers, III, Esq.
  *(Motion for Pro Hac Vice forthcoming)*
Todd P. Greer, Esq.
  *(Motion for Pro Hac Vice forthcoming)*
Michael W. Durborow, Esq.
  (*Motion for Pro Hac Vice forthcoming*)
*Whiteford, Taylor & Preston, LLP*
161 North Eagle Creek Dr. Ste. 210
Lexington, Kentucky 40509
mchilders@wtplaw.com
tgreer@wtplaw.com
mdurborow@wtplaw.com
Telephone: (859) 687-6700
Facsimile: (859) 263-3239
*Counsel for Plaintiff*